## MATILDA BAIRD v. C. J. T. BAIRD et al.

MARITAL RIGHTS. *Resulting trust. Wife's interest in land bought with her personalty reduced to possession by husband, and title taken to husband, extinguished.* A wife, M. B., consents to sale of her land for personalty, the personalty is exchanged by husband for other land and title taken to husband, husband then conveys this land for benefit of creditors. *Held,* on bill by the wife to set up a resulting trust in the land so conveyed to creditors:

1st. The marital rights of the husband attach to the personalty so exchanged.

2d. The wife has no resulting trust to the land conveyed to the husband in consideration of such personalty.

3d. The right of creditors to such land conveyed by husband for their benefit, is superior to right of wife.

4th. Any verbal promise by the husband to settle the land so exchanged upon the wife, is within the statute of frauds and therefore void.

### FROM WILSON.

Appeal from the Chancery Court at Lebanon. GEO. E. SEAY, Ch.

MARTIN & BEARD and W. H. WILLIAMSON for complainants.

R. C. & J. C. SANDERS for defendants.

FREEMAN, J., delivered the opinion of the court.

This bill is filed by the wife of C. J. T. Baird to assert a resulting trust in her favor, or at any rate, her title to a tract of land of 126 acres, composed of two smaller tracts, one of 92 acres, known as the Pool land, the other, 34 acres, as the Hudson tract. This land, treated as one tract, was conveyed by the husband in about 1872, to a trustee for the benefit

of his creditors, he having become insolvent—probably by reason of indorsements, and having removed, or about to remove, to Texas. After remaining there sometime and contesting for a homestead in lands in that State, which failed, he removed back to Tennessee, and then, January, 1878, his wife filed this bill to assert her supposed title to the land in controversy against the trustee and beneficiaries, enjoining the sale in the meantime until the contest should be decided.

The theory of her bill is that Seldon Baird, her father-in-law, soon after her marriage, in September, 1846, advised her to sell a tract of land derived from her deceased father, of 110 acres, for a family of negroes; and that he had plenty of "land for all his children and would provide a home for them." He is shown · to have been a man of fortune—estimated at $60,000—we believe.

She assented to the sale of her land, the trade being made by the father-in-law, the deed for her land not being made, however, until October, 1847, averring to the fact that both herself and husband were not of age at the time the trade was made—October 31, 1846. Seldon Baird took a bill of sale to himself at this time to the negroes, reciting the consideration to be $900, which was registered on acknowledgment by Shorter, the purchaser of the land, November 2, 1846. She says in her bill she did not know of this until sometime afterwards, but thought it had been made to her. Her theory evidently is, that if it had been, the negroes would have been her own, in which she is mistaken, as the property was taken to their home,.

Baird *v.* Baird.

at Seldon Baird's, where they resided up to July 1, 1848. The negroes, being personal property, would have been in possession of the husband, and his by virtue of the marital right. She, however, claims that soon after she had made her deed in October, 1847, the negroes remaining in possession of Selden Baird, the father of her husband, she urged him to send them to her, when he told her she had no negroes, but the negroes were his, that it was an exchange of the 100 acres of land for the 126 acres on which she and her husband were then living, which practically was the result of what was done. To this she said she objected, and said she would have a law-suit with him, to which he replied, "Pop your whip, I am ready for you." She then assumes that while she was opposed to all this, yet in time she acquiesced, with the understanding the title to the land. should be made to her, and that she supposed this had been done, until by accident, she learned ten years afterwards from a neighbor woman, that it had been conveyed to her husband, against which she remonstrated to him. As she says in her testimony, he went and talked with his father about it, and I think they concluded the title should be made to me, at least my husband assured me the deed should be corrected and the title made to me, and then adds, the matter has remained in that condition from then until the present. She says in this deposition, that she thought this had been done for ten years after her conversations with her father-in-law on the subject, which were in the latter part of 1847, or about that time.

The fact is, that the deed for the 92 acres was made by the father to the son, October 3, 1847, in consideration of $900, the price of the negroes, and registered, and the deed to the Hudson land was caused to be made October 15, 1847, but seems not to have been registered until 1853.

Her theory, however, of acquiesence, and understanding that the land had been conveyed to her for ten years after 1847, is totally disproved by testimony of her own witnesses in this case. Grissom, for instance, says that in the latter part of 1848 or 1849, before he went to West Tennessee, Seldon Baird got him to go and see her as a friend of the family, to take the land in the place of the negroes, and when he advised her to do so as the best she could do, she said she would if Seldon would make the deed to her, which he told Seldon. It had not then been done and she knew it. He says Clem Baird, the husband, and his wife went to town to have a deed prepared, or they told him so, but they also told him it was not fixed, "that her pap, Seldon Baird, said he would make the deed to Clem, her husband, and not to her, and this was the reason it was not fixed." He adds, "I heard nothing more about the matter before I left for West Tennessee. When I left, which was in the fall of 1849, they were still fussing about the land and negroes," that is, as is shown by other proof clearly, the wife was fussing with her husband about the matter.

The proof shows, by another witness of complainant, that she kept up a most angry contention about this property, and that she and her husband were sep-

arated twice, growing out of her contentious habit on this question. Martin says that he, with other neighbors, were called in for the purpose of settling the difficulty at one time in 1850, "and it was agreed," to use his language, "that Mrs. Clem Baird should have the land, and Seldon Baird the negroes." It is clear the title had not been acquiesced in up to this time, and equally clear that she did not believe it had been conveyed to her, as she assumes, or else why the contention and separation?

Another witness says: "Seldon Baird kept these negroes up to the time of his death, and until they were set free. Mrs. Matilda Baird *always* claimed these negroes, and wanted them. I have heard her say, in the presence of her husband, that if old man Seldon Baird would give her her property she would make Clem Baird as good a wife as ever was." From what we see in this record she evidently made him about as bad a one as ever was, and we can see this claim for what she called "her property" was at the bottom of it. The evident fact, both from her bill as well as the testimony, that she assumed the negroes were hers, and the husband had no right to them as husband, rebuts all her theory of acquiescence in taking the land for them and her belief it had been conveyed to her. The fact is, all this is an afterthought, when the husband had broken up, and they failed to get a home secured in Texas, the negroes emancipated, and they had returned to Tennessee. It was then, as a desperate resort, the idea was conceived of asserting a right to the land. It

is evident that her coverture had no influence in preventing a woman of her temper from asserting her rights. She had filed this bill in 1878, being still married. In addition, she knew of her husband conveying the land for the benefit of his creditors, but no word of objection or claim of title is shown on her part. The fact is, she knew, as the witness, Grissom, says, she told him Seldon Baird had refused to make her a title to it, but insisted it should be to his son. Expecting to get a homestead in Texas, she left without thinking of asserting any right to this land, knowing she had none in fact. The witness above quoted from says further, he heard her say, in the presence of her husband, that she intended to have her property if the law would give it to her, and she thought it would; that she continued to complain down to 1852, when he removed from the neighborhood. Up to that time she insisted Seldon Baird had wronged her, and taken her property from her. Some five or six years after this, he says, he heard her say that Seldon Baird had never given her her property. This would bring it up to 1857 or 1858. The property she claimed is clearly shown to have been the negroes received for her land.

None of this conduct or testimony can be reconciled with her theory, as she gives it in her bill and swears in her deposition, that she believed for ten years the land had been conveyed to her, and had accepted it for the negroes. It is all an afterthought. In fact, she says, herself, she contended for ten years either for the land or negroes.

We need not go further into this testimony. All the facts contravene the theory of complainant, and show that she swears in accord with her feelings and interest under the changed aspect of things rather than in accord with what occurred or was the state of things àt the time. We could but say, that while the son and husband professes, in his deposition, that he did not know the land had been conveyed to him, we are unable to believe this view of the case. If this had been true, instead of promising his wife that she should be satisfied out of property to be received from his father, to be secured to her and the children, he would have said to her, the land is conveyed to you, and this ought to satisfy you. If the fact had been as he says, when she found, as she says, the deed was to him, and told him of it, instead of talking to his father about it, he would have promptly settled his family contentions by making her a deed to it, and thus had peace on the easiest possible terms. Instead of conveying to creditors, he would have said, my wife is entitled to this land, and would have conveyed it then. At any rate, she, if her present claim was correct, would have insisted on its being done. The deeds were of record. He knew this, and it is incredible with this knowledge he should not have known their contents.

The fair result of all the testimony in the light of the attending facts is, that the father desired to give the land and retain the negroes for himself, probably this was better for both, and the son yielded to this view and assented to it, and was unwilling to

insist on his wife's view, because of the fact that he expected to receive property from his father, and thought he could satisfy her in this direction; in addition, in view of these expectations from the father, he did not wish, as he says, "to contrary him."

We think it certain, notwithstanding the son now swears he did not know the deed was made to him, that he did know it. They were both registered, the one for the larger tract immediately, and the smaller some years after. He no doubt repeatedly promised his wife to fix it up satisfactorily, especially when spurred to this by keen family contentions, but neglected to do it, and all this was submitted to by the wife, impatiently no doubt, but still nothing done, except to quarrel over it until this suit was brought by her next friend in 1878, upwards of thirty years after the original conveyance, and about eighteen or twenty years after she knew, by her own testimony, of the state of the title.

The first matter of defense argued by the respondents is, that the land received from the father was sold by the husband and wife for the negroes willingly, and this is clearly true. It is equally clear there was no agreement between them at or before this, that the proceeds should remain her separate property or be secured to her in any way. It is settled in this State, that in such case, the land is converted to personalty and subject to the rules that apply to the relation of husband and wife, as to personalty: *Ex parte Yarborough,* 1 Swan, 205; 5 Hum., 26; 9 Baxt., 413. But this right is not complete, as a

matter of course, until the husband reduces the property to possession or. obtains or exercises such dominion and control over it as its nature permits.   It is assumed there has been no reduction. of possession of the negroes, in this, so as to fix the rights of the husband in the negroes, and that they having been exchanged for the land by the father and the husband, they went into the land conveyed and in controversy in this case, as the property of the wife, free from the marital rights of the husband, and therefore she is entitled to have a trust declared in her favor and the property decreed to her into which her negroes went, as the consideration.   We proceed to dispose of this question.

If this land had been sold for money and received by the husband, the possession · would have certainly excluded the right of the wife.   If a note had been given, he had the right to receive the money, and the receipt would have been conclusive of her right.   The husband, it is equally clear, would have the right to assign and transfer such a note and when collected by the assignee the rights of the wife would be gone: See Waite's Act. & Def., vol. 3, page 638, and authorities cited.   As to the personal property of the wife in possession during coverture, his title becomes absolute, and if he can get control of it, without suit, he has the perfect right to do so, and then perfect his title to it, as he takes, by virtue of the marriage, whatever rights in such property the wife has at the marriage: See Waite's Act. & Def., 638; *Green* v. *Goodall*, 1 Cold., 404.

The title taken by the father to the negroes at the time from Shorter, gave an equitable right to the property to the husband in right of his wife. If suit had been brought in a court of equity to enforce this right, that court, at the instance of the wife, would have settled it in whole or in part on her, or would have done so at the instance of a next friend in her behalf. But no such suit was made necessary in this case. The father and son agreed to a disposition of the property. The effect of what was done was that the son disposed of the property in the negroes to the father, he being in possession, in consideration of the conveyance of the 126 acres of land. The fact that the legal title was in the father at the time made it unnecessary to go through the form of conveying to the son, and he conveying back to the father. The father being in possession when this transfer was assented to by the son and the land conveyed, the transaction was complete, and the reduction into possession complete by the assignee of the son. This was a complete exercise of dominion by the son over the wife's personalty, and cut off all legal right on the part of the wife. In other words, the husband had the right to sell the wife's interest in personalty, whether legal or equitable, and has done so. The property is in possession of the assignee, and so the title is complete.

The error in the theory of the wife in this cause is, that she had the absolute right to the negroes, the personalty received for her land. She had only the rights of a wife in a court of equity, always subject to be defeated by the act of the husband in re-

Baird *v.* Baird.

ducing the property to possession, or by disposing of it, and it being reduced to possession by the assignee in the lifetime of the husband. This last has been done, and her equities thereby disposed of and ended.

The principle of the case of *Lane* v. *Farmer*, 11 Lea, 573–4, sustains the view we have taken, and is conclusive of the result in this case. In that case the wife, after a divorce, sought to reach lands into which her guardian, as charged, had invested her money. Judge Cooper, delivering the opinion of the court, says: "But the fact that the husband was entitled to the funds of the wife in the hands of the guardian, at the time of the alleged use of such funds by the guardian, is conclusive upon the rights of complainant, even if the facts were sufficient to raise a resulting trust. The trust must have been in his favor, as the owner of the funds, not in favor of the wife. If he elected to take the land, it would be a reduction into possession of the chose in action thus converted." Here the husband, beyond question, consented to take the land for the negroes; has acquiesced for thirty years; and any promise made by him afterwards to settle the land on the wife, would be within the statute of frauds and void, and this is the most that can be fairly made out from the proof.

The result is, the report of the Referees is disapproved, the decree reversed, and complainant's bill dismissed with costs of this and the court below.

Upon petition to rehear, FREEMAN, J., delivered the following opinion:

A very elaborate petition for rehearing has been presented in this case. In deference to the commendable zeal of counsel, we proceed to notice the material points presented.

The keynote to the argument made is, that in 1850, when a separation was threatened between Matilda and respondent, Clem Baird, her husband, the neighbors were called in, and suggested a settlement between them, in which it was agreed the land in controversy was to be conveyed to Matilda, in lieu of the negroes received for her land, sold by her assent, to Shorter in 1846, and that this arrangement was accepted by her under the advice of those present as the best she could do. It is then argued that from this period on for ten years she believed this had been done, and only found out the contrary incidentally from a remark of a neighbor woman. Several conclusive answers are found to this. First, if it was admitted, the complainant would have no case, as the agreement would be within the statute of frauds—as an agreement to convey land in parol never executed, and by all our law could not be enforced. In the next place, the fact is not as stated, as shown by the whole body of the proof, that is, the assumption of her agreement to take this land, belief for ten years it had been conveyed, and acquiescence in it, because she assumed it had been done. It is seen this would take it to the year 1860, before the discovery was made.

We need but quote her own testimony on this question. She is asked, page 44 of the record,

Baird v. Baird.

" whether or not those men succeeded in settling your differences and reconciling you and your husband—if so, how?

Answer. I told them it would be all right if my father-in law would give me back my negroes. What these men did never had any effect on me. My husband told me after this meeting of these men that he would stand up to me, and I should have my rights."

Her rights, as she claimed them, were what she called *her* negroes, with the persistency of a wilful woman. She never proposed to recognize any marital rights in her husband. The law does, however, in such cases, and she must abide by it. It is beyond doubt, from what we have quoted, that no such theory is made out as maintained; on the contrary it is definitely rebutted. She does, however, say in her deposition, that after this meeting she agreed with her husband to take the land for the negroes, but this agreement is in the face of the statute of frauds, if true. Unfortunately it does exist in fact from the whole proof, and if so, could not be enforced.

She says, herself, she contended for the negroes about ten years. This would take her up to 1857, or 1856 certainly, and that would be six years after it is assumed she agreed to take the land in 1850.

It would be unprofitable to go again into the testimony to sustain the conclusions of the opinion. After careful and painstaking examination that conclusion was reached. A review, aided by the ingenious argument of counsel, but confirms the result thus

reached. There can be no question that she claimed the negroes till they were emancipated, and all the facts carry behind them the necessary implication that when they were emancipated, and her hope was gone in this direction, she and her husband probably caught at the idea of a trust in her favor in this land, and under that inspiration and afterthought this bill was filed.

We are satisfied the only legal result has been reached on the facts fairly weighed, and dismiss the petition with costs.